THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. FRANK D. SPIVEY, DEFENDANT-APPELLANT.

Argued January 22, 1974—Decided May 9, 1974.

Mr. *Edward P. Hannigan,* Assistant Deputy Public Defender, argued the cause for appellant (*Mr. Stanley C. Van Ness,* Public Defender, attorney).

Mr. *Ralph J. Jabbour,* Assistant Prosecutor, argued the cause for respondent (*Mr. Joseph P. Lordi,* Prosecutor of Essex County, attorney).

The opinion of the Court was delivered by

PASHMAN, J. Defendant appeals from his conviction of rape and robbery in violation of *N. J. S. A.* 2A:138–1 and 2A:141–1. He alleges that the trial court erred in failing to conduct a second competency hearing before or during his second trial. It is further contended that after defendant's first trial ended in a mistrial, the trial court erred in relying upon a jury verdict as to his competency to stand trial; that defendant was denied his right to be present at the competency hearing; that defendant was deprived of a fair trial in being tried while incompetent to stand trial; and that the prosecutor, in his summation, misinformed the jury on the issue of punishment. The same trial judge presided over the first trial, competency-sanity hearing and second trial.

On appeal to the Appellate Division, 122 *N. J. Super.* 249, the majority of the Court rejected sixteen allegations of error by defense counsel as well as five contentions of defendant's *pro se* application. In responding to defense counsel's allegation of error based on the trial judge's failure to grant a second competency hearing, the court noted that such a request was within the sound discretion of the trial court. Review would not be available in the absence of an indication that defendant "clearly and convincingly" appeared incapable of standing trial. *State v. Lucas,* 30 *N. J.* 37, 73–74 (1959). The dissent emphasized the factual history of the defendant as revealed to the trial court. Specifically, the dissenter was convinced that there existed a bona fide and reasonable doubt as to defendant's competency to stand trial. *Pate v. Robinson,* 383 *U. S.* 375, 385, 86 *S. Ct.* 836, 842, 15 *L. Ed.* 2d 815, 822 (1966). Appeal to this Court followed as of right pursuant to *R.* 2:2–1(a)(2).

We reverse and remand to the trial court for a new trial if, after an inquiry into defendant's competency, he is found able to stand trial.

Defendant, Frank Spivey, was charged with rape and robbery occurring on the evening of November 26, 1969. Com-

plainant was returning from a shopping trip when, while walking from the bus stop to a cab station, a man called to her from behind the wheel of a nearby truck. Unable to understand what was said, she walked closer to the truck which was occupied by two men. Complainant went to the passenger side where she was either pulled in or entered voluntarily. She then accepted an offer of a ride home. It soon became apparent, however, that the occupants had no intention of driving her home. After parking in a fairly isolated spot, the defendant, who was driving the vehicle, thrust complainant down and hit her over the head several times. He then is alleged to have taken money from her pocketbook. Testimony indicated that defendant ripped off complainant's bracelet, as well as various articles of clothing, and proceeded to force himself sexually upon her. Complainant was then pushed from the truck and threatened not to call the police. The defendant and passenger were apprehended later the same evening.

Defendant's first trial began on September 21, 1970 and ended two days later in a mistrial. Spivey's first contact with the trial judge involved an objection to his counsel and a request to be left in jail while the trial proceeded. The judge immediately questioned whether Spivey was "all right" and noted that he was "inclined . . . to have him examined by a psychiatrist." The following day, defendant interrupted the court during *voir dire* but was quiet for the remainder of the proceedings.

The next morning, Spivey attempted suicide. He was brought into court without his shirt on. He refused to have a bruise treated and shouted at everyone to leave him alone and let him die. The judge noted he was prepared to bind and gag him if absolutely necessary, but continued efforts to calm him and speak to him quietly and rationally. Based on defendant's outbursts in court and counsel's professed inability to communicate with his client, defense counsel made a motion for a mistrial. The motion was denied.

Spivey continued to interrupt the judge, who finally ordered him gagged and handcuffed.

> THE COURT: Mr. Grieco, as I indicated to you out of the presence of the jury, this man knows what he is doing.
> DEFENDANT SPIVEY: How do you know? You are not a doctor. You are not a psychiatrist. You are a judge. That's what you are.
> THE COURT: Gag him. Put your hand on him. Unfortunately these defendants know what went on in Chicago. These defendants know what other defendants have done in other states. As far as this Court is concerned, your motion is denied. That's all there is to it.

Defendant then continued making loud noises and was removed from the courtroom over defense counsel's objection.

Upon entering the courtroom after opening statements of counsel, defendant, in response to questioning by the court, stated his refusal to behave in front of the jury. The judge, noting his own obligation to act even in the absence of defense counsel's suggestions, indicated his belief that "plain fair play" and decency required this man to be examined: "[W]ho am I to say whether this man is a faker or whether his attempted suicide is part of a mental illness?" In responding to the prosecutor's pointing out that defendant seemed capable of following the proceedings and was aware of what each party was doing, the judge took note of another suicide attempt by the defendant, just subsequent to his arrest, and then ordered an examination.

> THE COURT: I can't shut my eyes to this. I won't sleep. I can't. I won't do it. I have to have professional help here. I won't do it. I don't know whether it's part of a pattern. There are two more prisoners upstairs who said they are not coming down. I don't know whether it's part of what is going on in New York or Chicago or California — that's all secondary. This man is a human being. I am going to treat him as such.

The court arranged to have defendant examined by the Essex County Psychiatrist, Dr. Martin.

His temporary diagnosis was that Spivey was suffering from an "acute psychotic episode" rendering him unable to communicate. Dr. Martin noted Spivey's prior history of hospitalization and a prior diagnosis of schizophrenic reaction, chronic, undifferentiated type. It also appeared that Spivey had been given approximately ten electric shock therapy treatments while hospitalized at either Greystone Park or Overbrook Hospitals between 1966 and 1968. It was his opinion that at this stage, Spivey was unable to confer with counsel. The judge thereupon directed that defendant be examined by two additional psychiatrists and noted his intention of proceeding under statutory authority to determine defendant's competency to stand trial as well as his sanity at the time the offense was committed. Defendant's motion for mistrial was granted.

Defendant remained in the Essex County Jail until October 8, 1970, at which time he was committed pursuant to *N. J. S. A.* 30:4–82 by order of the trial judge. Notice of a hearing to be held on October 27, 1970 as to defendant's commitment to the New Jersey State Hospital was personally served on defendant on October 9, 1970 at the hospital. This hearing was not held until January 1971. No explanation could be found for its being postponed. Immediately after receiving notice of the October hearing date, defendant, being of the opinion that he was in a hospital with convicted people, drew a *pro se* petition for his release. The petition was denied after a hearing before Assignment Judge Kingfield on November 5, 1970. Petitioner was well behaved, answered all questions addressed to him, and cooperated with the court. The order denying Spivey's petition was not entered until January 6, 1971. Spivey wrote another petition challenging his confinement on November 6, 1970. Apparently no action was taken on it.

In the interim, the trial judge had proceeded with scheduling a hearing pursuant to *N. J. S. A.* 2A:163–2. He met with counsel on November 30, 1970 and noted his intention to empanel a jury. This is contrary to an assertion at trial

that he intended to hear the matters of competency to stand trial and sanity without a jury. No explanation for this change could be found in the record, nor could it be explained by subsequent communications with counsel.

The hearing was held on January 4 to 6, 1971. The defendant was not present.[1] Spivey received no formal notice, as he had for the originally scheduled hearing date, but was apparently told of the hearing by his wife, who had received notification and communicated this to her husband about twelve days prior to the hearing. At the outset, the defense noted that the inquiry was a three-fold inquiry relating to competency to stand trial, present sanity, and sanity at the time of the crime.[2] Defense counsel's statement indicated that the trial judge had already related this to the jury. Three doctors testified. Drs. Sol S. Winsten and Henry A. Davidson were called by the defense.

Dr. Winsten had occasion to examine the defendant on September 30, 1970 in the Essex County Jail. His diagnosis was that defendant was suffering from schizophrenia, paranoid type, chronic and could not confer with counsel. The doctor opined that Spivey was insane when the crime was committed. He also noted that while the defendant knew the full significance of the charges and that society felt that

---

[1]The transcript reveals no mention by the court or defense counsel as to defendant's absence. The prosecutor, however, did point out in his summation to the jury that "unfortunately he was not here, significantly he was absent, no explanation for his absence was given." It is clear, however, from remarks at oral argument and subsequent communications with counsel, that the defendant was aware of the hearing and that, for one reason or another, he refused to be present. The Court need not address itself to the consequences of these circumstances in that today's holding renders defendant's absence moot.

[2]"* * * This is a sanity hearing, to determine the sanity of Mr. Frank Spivey, and as Judge Camarata has indicated to you, your function as judges of the facts will be threefold. First you must decide whether Mr. Spivey can consult with me, his attorney, in an intelligent manner, so that I can prepare his case and defend his case, two, you must decide whether he is insane today, and three, you must also decide whether he was insane on November 26, 196[9]."

rape was wrong, the defendant did not feel that way himself. On cross examination, Dr. Winsten indicated that his examination lasted one hour and that he was satisfied from his twenty-eight years of experience that Spivey was not a faker. He also reiterated his belief that defendant "could not properly confer with his attorney, because of his disordered thinking."

Dr. Davidson saw the defendant both in December 1969 and November 1970. His diagnosis was in accord with Dr. Winsten — paranoid schizophrenia. Defendant knew the nature of his act, and that it was wrong in society, but that it was not wrong for him to do it. Dr. Davidson felt that defendant was insane and could not confer with counsel, although the doctor stated that this is not necessarily so with all insane persons.[3] He also opined that defendant was probably insane at the time of the crime and that the defendant was not faking.

It was brought out in cross examination that defendant's hospital records revealed numerous commitments to mental hospitals, some of which resulted in a diagnosis of psychosis, anti-social reaction, or, not insane. Dr. Davidson did not

---

[3]"Now, the word paranoid means having a systematized delusion of persecution. The word itself, paranoid, by itself, does not mean necessarily that a person is insane, because there are people who think they are being picked on and persecuted all the time, and are not necessarily insane. Paranoic schizophrenia is, of course, a species of schizophrenia, and it is characterized by the sense of being isolated from the world, being surrounded by hostile people, and so this was my conclusion after these two examinations.
\* \* \*
THE COURT: He was insane, in your opinion? A Yes, he was sir.

THE COURT: *Well then, if he was insane, in your opinion, can I assume that he was then incapable of conferring with counsel?* A *I don't think the — that the events necessarily follow.* In this particular case he was incapable of conferring with counsel because of the way in which he saw these events through the distorted lens of his sickness, but there are insane people who are capable — (emphasis added).

alter his diagnosis, although his credibility was attacked as a result of his having been given the records of another Frank Spivey who was also institutionalized and diagnosed as a schizophrenic paranoid type. Dr. Davidson again stated that Spivey's ability to communicate with his lawyer was "rather seriously impaired," and expressed his disagreement with the diagnosis of anti-social reaction.[4]

Dr. Joachim G. Elizondo, affiliated with Trenton State Hospital, was called by the State. After noting that this was defendant's seventh time at Trenton State Hospital, he disagreed with the other two psychiatrists and stated that Spivey was not and never had been insane. It was his opinion that defendant knew right from wrong, that he wanted to be sent to the hospital, that he knew how to get there and that he admitted being a faker. The court repeatedly questioned Dr. Elizondo as to why he felt that Spivey was not insane, given that he had recently attempted suicide on two occasions and had been in and out of mental institutions for a decade.

---

[4]"Now, not everybody in a mental hospital is insane, of course. However, seven admissions to a mental hospital it seems to me makes a pretty good case for a rather serious level of mental illness.

Two, the sense of his being a victim of a persecution is somewhat different in quality from the feeling that many criminal defendants have, that the cops are out to get me, or something like that. I mean, this has this quality which I previously characterized as bizarreness.

Three, the degree of depression — at my first examination I considered to be at the psychotic level.

Now, there is a lot of argument at what point an ordinary depression is purely neurotic and at what point it crosses an imaginary frontier into the insane level. It's hard to tell. I felt it was psychotic, but at my more recent examination he was extremely labile, emotionally labile, in the sense it fluctuated from depression to over-talkativeness, and overproductivity.

I put all this together, and I say to myself, this is a mentally sick man, this is not a man in good mental health by any stretch of the imagination, and so I respectively disagree with the judgment of the doctor in the Vroom Building."

Q This man has been in and out of institutions, including Trenton Hospital for the insane and Overbrook seven different times? A Well, he has been in institutions since before that time. He started —

Q I am talking now, institutions for the mentally ill. A Correct.

Q In your expertise, Doctor, doesn't that indicate that this man needs care and treatment, and perhaps if he had been kept in these institutions he might not be faced with these indictments? A No. That indicates emotional instability, lack of growth, and an individual that is highly, like Mr. Spivey, completely disregards our laws of society.

Q Now, every time he is committed to any one of these institutions, he must be — it must be done according to the law — and there must be two doctors to certify him? A Yes.

Q Just like you, in that opinion, they felt he was commitable? A Yes.

Q How much importance did you attach, in arriving at your opinion, to the fact that he had been in these institutions seven different times? A Because he is very childish, has temper tantrums, explodes, has an explosive personality, is easily angered, but that doesn't mean he doesn't know. Oh, he knows quite well he is easily angered. He knows.

\* \* \*

He knows. He says, "I know that many times is my own fault."

As to his belief that Spivey was a faker, Dr. Elizondo apparently relied upon statements made to him by the defendant.

Q All right, now you said a moment ago that the applicant told you that he would fake the mental illness? A Yes. He has done many times that.

Q Is that normal for an individual to do that? A He cannot take stress very much. He was getting into trouble and in jail, well, they don't handle them with white gloves.

Q That's what he told you? A Yes. So he has learned that he is more comfortable in the State Hospital. For instance, he got into trouble in Annandale once, and he was trying to commit suicide to hang himself, and they put him in the lock-up, what they call the lock-up. He didn't like it, after a few days said "I cannot take the lock-up," so what is he going to do? He was advised by all their inmates, "Fake mental illness, tell the doctor that you hear voices, and so forth, and they send you to the State Hospital," and he did, and he told us, "What did you tell to the psychiatrist?"

"Oh, Doctor, that I was seeing green man."

"Is that true?"

"You know that I was joking."

He tells me that. He has told me that.

THE COURT: One other thing Doctor, in your prognosis under a date of November 6, 1970, you wrote, I think, a synopsis of what you have testified to Dr. Davidson and you said, among other things he will constitute a behavioral problem in any environment. Is that correct? A Absolutely.

Dr. Elizondo recommended Spivey's release from further hospitalization with the added recommendation that he continue to take 150 mgs. of thorazene spanzol once a day to quiet him down.

Further references were made on cross examination as to the effect of this medication. Dr. Elizondo noted that although defendant certainly calms down after being given medication, he "would have calmed down even without the medication, just by removing of the environment that caused him to blow his top." Defense counsel then clarified the extent to which Dr. Elizondo had been exposed to the defendant.

Q So your exposure to him in this calm state was after he was given this tranquilizer, in effect? A Come again? I didn't get that.
Q Your exposure to him in this calm state was after he was given the tranquilizer, isn't that a fact? A That's correct.

At no point in Dr. Elizondo's testimony did he venture an opinion as to Spivey's competency to stand trial. He stated only that defendant was not insane.

In his charge to the jury, the judge meticulously explained the three separate inquiries involved and the test for each. The defendant was found competent to stand trial, not legally insane on November 26, 1969, and presently sane. The judge did not attempt to conceal from counsel his disagreement with the verdict.

THE COURT: I have indicated to both you gentlemen how I felt if I were trying this case without a jury. This is on the record. Having seen Mr. Spivey, having seen what he did, and how he did it, . . . there is no question in my mind this man is insane. Probably what happened with the jury here, and I understand very rarely do they come in with a verdict of insanity at the time of the crime, they feel let the case be tried, let that jury decide the facts, let that jury de-

cide the insanity, because nobody is going to convince me that in our state institutions that are crowded with the walls bulging you are keeping anybody in there who is not mentally ill. * * *

Defendant wrote another petition challenging his retention in the State Hospital on January 10, 1971. He refers to the November 5, 1970 hearing before Judge Kingfield and also points out that he was found sane at the January 4, 1971 hearing. Judge Kingfield held a hearing on January 28, 1971 on defendant's petition. Defendant was equally well composed before the court as he was for the November 5, 1970 hearing. Judge Kingfield decided not to take any action when he was informed of the prior sanity hearing and new trial. An order to that effect was issued on April 1, 1971. Finally, on April 23, 1971, the trial judge entered an order remanding defendant to the Essex County Jail. The delays were apparently the result of confusion as to whether defendant could be supervised by hospital personnel throughout the trial.

Defendant's second trial was held during the first week in May 1971, approximately four months after the sanity hearing and before the same trial judge as the first trial and competency-sanity hearing. Defense counsel presented the court with the results of an examination of defendant, which was conducted a few days before, by Dr. Sol Winsten. It was the doctor's opinion that defendant was both incompetent to stand trial and insane. The trial judge refused to adjourn and conduct another inquiry as to defendant's competency and sanity at this time, being of the opinion that "there must be finality to the matter." Counsel's plea, based on the four month delay and the court's apparent difficulty in having defendant released from the State Hospital, was rejected. The judge noted that insanity would be dealt with at trial. Had a statement as to incompetency or insanity been submitted by the State's phychiatrist, Dr. Elizondo, the judge noted that he would have been inclined to grant the motion for a sanity hearing, but solely on the basis of Dr.

Winsten's report, which was to the same effect as his testimony at the previous hearing, the judge was not prepared to postpone the proceedings.[5] A few days before trial, Dr. Winsten had even signed a commitment order which the judge nullified.

The defendant was brought into court for the jury selection and immediately began raving about wanting another lawyer and not wanting to be present. He was gagged and then began emitting moaning and groaning sounds. The judge ordered him taken out of the courtroom. He was brought in again after an attempt to calm him down. Defendant continuously interrupted the proceedings by refusing to listen to the court, shouting names at the bench, braying like a jackass, and grunting like a pig. This harangue continued uninterrupted for seven minutes, at which time defendant was again gagged and handcuffed to the chair. He then began rattling the handcuffs and moaning, at which time he was taken out of the courtroom. The jury panels were finally called. The defendant was brought back and immediately began braying with his mouth wide open. He then threw himself to the floor. The judge then decided to hold jury selection in defendant's absence, although court attendants checked on his behavior periodically in an attempt to obtain his assurances that he would behave

---

[5]"THE COURT: If there was a statement from Dr. Elizondo or Dr. Rotoff, or Dr. Boyd from the Trenton State Hospital, to this effect, I might be inclined to agree with you, but as of now I am not going to adjourn the case for that reason.

MR. GRIECO: Your Honor, may I argue further on this point, for the record?

THE COURT: Yes.

MR. GRIECO: I think, your Honor, that the fact that the officials at Trenton State Hospital did not certify Mr. Spivey until approximately two weeks ago, I think indicates that in their own mind, notwithstanding the testimony of Dr. Elizondo, that this man is not sane at the present time.

THE COURT: That's something you may have to ask the doctor on cross examination."

in the courtroom. Subsequent attempts to bring defendant into the courtroom were futile. The court noted in conclusion that Spivey was conscious of his disruptions and that it was equally apparent that defense counsel could not communicate with the defendant. Two further attempts to bring defendant up were thwarted when he ripped off all his clothes. He was finally brought in again and began braying. The judge decided to put him in a cell adjacent to the court and noted that defendant "has set out by design to disrupt the proceedings of this court." Defendant was brought in again and began kicking the table and moaning. The judge noted he was satisfied that Spivey knew what was transpiring and was refusing to cooperate. The jury was brought in and instructed that the trial would commence without defendant's presence until there were assurances that he would comport himself properly. Numerous other attempts were made to bring the defendant into court. At one point, he kicked, cursed and then spat at defense counsel. The judge again noted his belief that the defendant was faking and denied counsel's request for a psychiatric examination. At times throughout the trial, screeching and banging on the walls could be heard from the cell in which defendant was kept. Once again, the defense called Dr. Sol Winsten, who testified as to defendant's current insanity, although he could not give a definite statement as to whether defendant was insane at the time of the crime. Dr. Henry Davidson was unable to be present, but excerpts of his prior testimony at the sanity hearing were read into the record. The State called Dr. Elizondo in rebuttal.

Defendant was found sane both at the time of the crime and presently, and guilty to both counts of rape and robbery. He was recommitted to Trenton State Hospital from May 14, 1971 until July 22, 1971, the day before sentencing.

He was subsequently sentenced for sixteen to twenty-three years on the rape count with a concurrent six to nine year term for robbery. Defendant had entered the courtroom humming, screaming, spitting and knocked over a counsel

table and two chairs. Seven attendants held him down throughout the proceeding. He was gagged and continued to make loud noises. Spivey was finally removed from court and began yelling and crying upon hearing the sentence through the open courtroom door.[6]

The standard to be applied in determining whether one is capable of standing trial was clearly set out in *State v. Auld,* 2 *N. J.* 426, 435 (1949):

> One unable to comprehend his position, to consult intelligently with counsel and plan his defense cannot be put to trial. If the condition of a defendant's mind is brought into question in this respect at the time of pleading or at trial, either from observation or at the suggestion of counsel the question should be immediately settled. \* \* \*

See *State v. Gibson,* 15 *N. J.* 384, 387–388 (1954); *State v. Lucas,* 30 *N. J.* 37, 73 (1959); *State v. Caralluzzo,* 49 *N. J.* 152, 155 (1967). The determination of this preliminary question is within the inherent power of the court.

> \* \* \* The method of settling this preliminary question, where it is not the subject of statutory regulation, is within the discretion of the trial court. The court can itself enter upon the inquiry, or submit the question to another jury empaneled for that purpose. (*State v. Peacock,* 50 *N. J. L.* 34, 36 (Sup. Ct. 1887), rev'd on other grounds, 50 *N. J. L.* 653 (E. & A. 1888)).

See *State v. Lucas, supra,* 30 *N. J.* at 73. However, absent any indication of incapacity to stand trial, the court is not bound to interrupt a trial. "Mere suggestion" of incapacity is not sufficient.

> \* \* \* No court would be bound to stop, or justified in arresting the progress of a trial by a mere suggestion of, but in the absence of any substantial evidence of the existence of a degree of mental disorder

[6]It was indicated by letter that the defendant is not now in the general prison population but is in the Readjustment Unit located in Trenton State Hospital.

which would unfit the defendant from conducting his cause or instructing his counsel. \* \* \*(*State v. Peacock, supra,* 50 *N. J. L.* 34, 36).

See *Amador Beltran v. United States,* 302 *F.* 2d 48, 50 (1 Cir. 1962) (There can be no affirmative duty to investigate unless the court is on notice that something is amiss).

██ This Court has held that while the court has power to order a competency hearing *sua sponte,* the standard of review for failure to initiate the inquiry is a strict one. *State v. Lucas,* 30 *N. J.* 37 (1959).

> But while the court has the power to order an inquiry in the defendant's mental qualifications to stand trial, failure to exercise the powers will not be reviewed on appeal, unless it clearly and convincingly appears that the defendant was incapable of standing trial. It is to be ordinarily expected that defense counsel, who is in a far better position than the trial judge to assay the salient facts concerning the defendant's ability to stand trial and assist in his own defense, would originate the request that such an inquiry be conducted. (30 *N. J.* at 73–74).

The "clear and convincing" standard of review of a trial court's refusal to grant a competency hearing is, however, practically met when there is a "bona fide doubt" as to defendant's competence to stand trial. *Pate v. Robinson,* 383 *U. S.* 375, 385, 86 *S. Ct.* 836, 842, 15 *L. Ed.* 2d 815, 822 (1966).

Defendant in *Pate* had a long history of disturbed behavior, had been hospitalized, killed his son and attempted suicide. Throughout the trial, defense counsel put defendant's present sanity in issue, which should have, in view of defendant's history, alerted the trial court to the need for a determination as to defendant's competency to stand trial. See *United States v. McEachern,* 465 *F.* 2d 833 (5 Cir. 1972); *United States v. Marshall,* 458 *F.* 2d 446 (2 Cir. 1972); *Thomas v. Cunningham,* 313 *F.* 2d 934 (4 Cir. 1963). The *Pate* standard has been applied in New Jersey. *State v. Pugh,* 117 *N. J. Super.* 26 (App. Div. 1971), certif. denied 60 *N. J.* 22 (1972); *State v. Hale,* 116 *N. J. Super.*

106 (Law Div. 1971), aff'd 120 *N. J. Super.* 469 (App. Div. 1972).[7]

 Shortly after the commencement of the second trial, it became quite clear that Frank Spivey may very well have lacked the capacity to stand trial. The trial judge in no way attempted to conceal his misgivings concerning the jury verdict in the prior hearing as to defendant's competency to stand trial. Four months had elapsed since that time and certainly no one contended that the defendant had in any way regained his ability to confer with counsel. Just prior to the second trial, one of defendant's psychiatrists had in fact attempted to re-commit him, an attempt which was thwarted by the trial judge. The disruptions caused by defendant speak for themselves. They were more violent, continuous and abusive than the antics which characterized the mistrial more than seven months earlier.

In all fairness to the trial court, it should be noted that there existed the concern that defendant was faking. This is a legitimate concern which should not be dismissed lightly. Considering, however, the defendant's extensive medical history in mental institutions prior to the date of the offense for which he was convicted, the possibility of sham fades abruptly. More persuasive is the trial judge's acquaintance with defendant's history, having presided over the mistrial and competency hearing.

While our holding renders unnecessary a discussion of defendant's abundant claims of error as to the conduct of the competency hearing, one fact bears repeating. At no time during the hearing did Dr. Elizondo ever state that the de-

---

[7] In *State v. Hale*, while all the psychiatrists testified to defendant's need of psychiatric care, none stated that he was insane. Hale's background revealed disturbed behavior due primarily to excessive drinking. Competence to stand trial was never brought into question. Defendant conducted himself normally and cooperated fully at trial. Nothing in the record gave rise to a bona fide doubt of defendant's capacity to stand trial. Similarly, in *State v. Pugh*, all examining psychiatrists agreed as to defendant's ability to stand trial.

fendant was competent to stand trial. He stated only that Frank Spivey was not insane. The other two psychiatrists specifically noted defendant's incapacity to stand trial, as did the county psychiatrist, Dr. Martin, in a previous examination.[8] This takes on added importance in that the trial court would agree to reconsider its denial of a second competency hearing only if Dr. Elizondo or someone from Trenton State Hospital would call defendant's mental condition into question.

The Court must be careful to distinguish between insanity and incapacity to stand trial. An insane defendant may very well be capable of standing trial. This was noted by the court in *State v. Noel*, 102 *N. J. L.* 659, 671–672 (E. & A. 1926):

* * * The fact that a person has been adjudicated a lunatic does not mean that he is exempt from prosecution for the commission of a crime. Insane persons may be adjudicated insane and be committed for the protection of the public against violence, or for the care and cure of the person committed, or for the conservation and management of the lunatic's property. A regular inquisition is not conclusive. In cases of confinement, where the confinement is made for the protection of the public or for the care of the individual, the commitment is evidential of nothing more than a condition justifying the confinement. A commitment adjudges no more than that it is necessary to confine the patient for the good of the public or himself, or both. The fact that a person has been committed as insane has no necessary relation to the question whether such a person can intelligently go to trial for a crime. * * *

*State v. Gibson,* 15 *N. J.* 384, 387 (1954).

---

[8]Compare *Commonwealth v. Kennedy*, 451 *Pa.* 483, 305 *A.* 2d 890 (Sup. Ct. 1973), where the court reversed defendant's conviction and ordered a new trial. There was no affirmative statement in the record as to defendant's competency to stand trial. As to medical testimony at defendant's competency hearing:

* * * Two of the doctors unequivocally declared appellant incompetent because he was unable to cooperate because of his illness. The third doctor although unable to testify with certainty one way or the other, made it clear he had serious reservations as to appellant's ability to cooperate with counsel. 305 *A.* 2d at 892.

The differing focuses of inquiries into capacity to stand trial and insanity, either present or past, are definitely stated in *Aponte v. State*, 30 *N. J.* 441, 450 (1959). Chief Justice Weintraub referred to the confusion which sometimes arises in distinguishing between incapacity and insanity inquiries and pointed out the separateness of the questions involved. "The fact that an accused may be committable civilly by reason of . . . tendencies here claimed does not of itself establish inability to stand trial on an indictment." 30 *N. J.* at 452. See *State v. Caralluzzo, supra,* 49 *N. J.* at 156–158; *State v. Coleman,* 46 *N. J.* 16, 40, cert. denied 383 *U. S.* 950, 86 *S. Ct.* 1210, 16 *L. Ed.* 2d 212 (1966); *State v. Noel, supra,* 102 *N. J. L.* at 671–672. No further elaboration is required here, except to point out that this inability to correlate sanity or insanity with the lack of capacity to stand trial was specifically addressed by Dr. Davidson, as noted earlier. It is the duty of the trial court to constantly make known the distinction between competency to stand trial and sanity. While engaging in extensive questioning of Dr. Elizondo, the trial court neglected to clarify this critical point.

■ The trial judge began defendant's trial after having once adjudicated his competency to stand trial. This first competency determination, while evidence as to defendant's condition, is by no means conclusive. The court's responsibility to prevent the trial of an accused unable to assist in his defense is an on-going one.

* * * [A] judge's responsibility to guard against the possibility that an accused person may have become incompetent does not end when the trial begins. A hospital report is only a prediction that when the accused is tried he will be able to participate adequately in the proceedings. Later developments may throw doubt on the prediction, particularly when * * * the report does not show the hospital's understanding of "competence" * * *. (*Pouncey v. United States*, 121 U. S. App. D. C. 264, 349 *F.* 2d 699, 700 (1965)).

The hospital report referred to above focused on defendant's "sanity" without specific reference to the criteria for com-

petency to stand trial. See *Dusky v. United States,* 362 *U. S.* 402, 80 *S. Ct.* 788, 4 *L. Ed.* 2d 824 (1960). Similarly, at Spivey's competency hearing, the one psychiatrist who claimed that defendant was sane never was asked whether he felt defendant was competent to stand trial. In *Pouncey v. United States, supra,* defendant received a mental examination pursuant to 18 *U. S. C. A.* § 4244, which does not require the judge to hold a hearing unless the report indicates the accused's mental incompetency. The hospital report indicated, in conclusory terms, that defendant was without mental disease or defect and was competent to stand trial. There was no disagreement among members of the examining panel. Doubts as to defendant's competence were created by his accusing his attorney of being "in cahoots" with the government, testimony that defendant habitually distrusted his attorneys and his disregard of his attorney's advice in stating in the jury's presence his desire to plead guilty. These occurrences were sufficient to create a "close" question, which indicated that the trial judge "should have responded in some way to appellant's erratic behavior" regardless of the favorable hospital report. 349 *F.* 2d at 701.

In *United States v. Davis,* 365 *F.* 2d 251 (6 Cir. 1966), defendant alleged the trial court abused its discretion in ordering more than one hearing on the question of his competency to stand trial. At the first hearing, defendant was found unable to cooperate with counsel and was committed for proper treatment. Four months later, a hearing was held from which the court concluded defendant had recovered and was able to stand trial. Defendant's conduct at a preliminary hearing one month later, in requesting the court to discharge his attorney, prompted the court to again institute a hearing as to capacity to stand trial. Defendant underwent psychiatric examinations for almost two months, at which time the court concluded that "defendant was not able or willing to cooperate with counsel" and that he would

be hospitalized. This order formed one of the bases of the appeal. The court upheld the trial court's actions.

* * * In considering the question of mental competency, the courts have found no problem in the trial judge adequately satisfying himself that the defendant is competent to stand trial, even to the extent of holding more than one hearing, although the statute does not specifically provide for a second hearing. *Feguer v. United States*, 302 *F.* 2d 214 (C. A. 8), *cert.* denied, 371 *U. S.* 872, 88 *S. Ct.* 123, 9 *L. Ed.* 2d 110; *Crabtree v. United States*, 209 *F.* 2d 164 (C. A. 5), *cert.* denied 347 *U. S.* 961, 74 *S. Ct.* 710, 98 *L. Ed.* 1104; *United States v. Levy*, 232 *F. Supp.* 661 (N. D. Fla.). * * * (365 *F.* 2d at 254–255).

Even where disruptive erratic behavior is predicted, courts will not substitute such predictions for their considered judgment as to a defendant's competency to stand trial. *Cf. United States v. Marshall, supra,* where defendant's conviction was upheld in that the court had no reasonable basis to believe defendant was not competent to stand trial. A psychiatric examination found defendant to be psychotic but able to stand trial. The report noted that he may engage in bizzare behavior to appear psychotic, and that a psychiatrist unfamiliar with his past history might conclude differently. Subsequently, at a suppression hearing, the defendant accused the government of lying and his attorney of being a government agent. The trial court began doubting defendant's competency and again granted defendant's motion for psychiatric examination, even though his behavior had been predicted. The second diagnosis was essentially the same. During the trial, defendant did cooperate to some extent with his attorney, although at times shouted obscenities, absented himself from the courtroom, was removed from the courtroom for disruptive behavior, threw a chair toward the jury, and cut his wrists and tongue with a razor blade while in court.

The time elapsed since previous examinations, as well as defendant's conduct at trial, must be taken into account. In *United States v. Cook,* 418 *F.* 2d 321 (9 Cir. 1969), a motion during trial for a second psychiatric examination

pursuant to 18 *U. S. C. A.* § 4244 was properly denied where defendant was found competent to stand trial at a previous examination two months earlier. The denial of a second examination was based on the showing made and time elapsed since the first examination. While defendant tended to ramble in responding to counsel's questions, this alone was not sufficient grounds for instituting an incompetency proceeding. But see *Meador v. United States,* 332 *F.* 2d 935 (9 Cir. 1964), wherein the trial court was in error for relying upon a psychiatrist's testimony which was three and one-half months old and based on a five month old hospital report. *Cf. Hall v. United States,* 410 *F.* 2d 653 (4 Cir.), *cert.* denied, 396 *U. S.* 970, 90 *S. Ct.* 455, 24 *L. Ed.* 2d 436 (1969); *United States v. Taylor,* 437 *F.* 2d 371, 381–382 (4 Cir. 1971) (Sobeloff, Circuit Judge, dissenting).

The behavior of Frank Spivey was far more extreme than that of any defendants in the above cases. While *United States v. Marshall, supra,* may be an exception to this, defendant therein demonstrated his ability to communicate with counsel at various points throughout the trial. Such is not the case here. Defense counsel endured being spat upon and cursed at in his attempt to present a defense for a totally uncommunicative client. While it may be that defendant was aware of what was going on, as his numerous remarks and *pro se* applications indicated, such knowledge is not necessarily conclusive on the question of one's ability to consult intelligently with counsel and assist in his own defense.

Several additional observations should be made. We feel compelled to register our dissatisfaction with the failure of courts, attorneys and psychiatrists to adequately distinguish between competency and insanity standards. Particularly vexing is the indiscriminate use of the word "insanity" when incompetency (or incapacity) to stand trial is at issue. The use of "insanity" can serve only to confuse the various tests, especially when juries are involved. The use of the same term to indicate three separate standards of evaluation can

be no less than chaotic, regardless of the clarity of instruction by the trial judge. See *United States v. McEachern, supra,* 465 *F.* 2d at 836.

Also, it should be noted that the existence of an issue as to capacity to stand trial does not necessarily lead to a trial as to insanity. *N. J. S. A.* 2A :163–2 and 2A :163–3 inferentially embrace the common-law procedure for the trial of the issue of capacity to defend. *Aponte v. State, supra,* 30 *N. J.* at 455. There is no requirement, however, that questions of competency to stand trial, insanity at the time of the crime, and continuing insanity be tried together. *State v. Walker,* 15 *N. J.* 485, 494 (1954) ; *State v. Stern,* 40 *N. J. Super.* 291, 294–295 (App. Div. 1956). If the competency question is the only matter before the court, then competency to stand trial is all that should be tried. In any event, the capacity question should be resolved before dealing with insanity questions. *Aponte v. State, supra,* 30 *N. J.* at 455. We cannot overemphasize that these are separate questions with separate standards. The distinctions should be rigorously respected.

Having examined the jury trial given Frank Spivey on the questions of incapacity to stand trial and insanity, we feel it necessary to reaffirm our conviction that although capacity may be determined by a jury, "we think it ordinarily more appropriate that that issue be tried by the court alone." *Aponte v. State, supra,* 30 *N. J.* at 455. It would be an endless task to single out those numerous instances, as indicated by the transcript of Frank Spivey's hearing, where the presence of a jury unnecessarily complicates an already confusing area, particularly where the competency to stand trial and insanity questions are given to the jury together.

Lastly, it should be noted that we are remanding for a new trial after a hearing solely on the question of defendant's competency to stand trial. Defendant has had his pretrial opportunity to assert his insanity defense and will be given an opportunity to assert it at trial. He is not

entitled to a second pretrial determination as to his sanity at the time the offense was committed and whether he is currently insane.

Reversed and remanded.

*For reversal and remandment*—Chief Justice HUGHES, and Justices JACOBS, HALL, MOUNTAIN, SULLIVAN and PASHMAN—6.

*For affirmance*—None.