UNITED STATES of America ex rel. Thomas TRANTINO, Appellant,

v.

Robert HATRACK, Superintendent, New Jersey State Prison at Rahway.

No. 76–2018.

United States Court of Appeals, Third Circuit.

Argued March 31, 1977.

Decided Aug. 1, 1977.

As Amended Aug. 24, 1977.

Jeffrey E. Fogel, Newark, N. J., for appellant.

William F. Hyland, Atty. Gen. of New Jersey, Trenton, N. J., for appellee State of New Jersey; Susan W. Sciacca, Deputy Atty. Gen., Div. of Crim. Justice, App. Section, Princeton, N. J., of counsel and on the brief.

Before VAN DUSEN, GIBBONS and GARTH, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge.

This appeal from a denial of habeas corpus relief involves three claims stemming from petitioner Trantino's alleged ingestion of psychoactive drugs before and during his trial for murder. The district court found all three claims to be meritless. 408 F.Supp. 476 (D.N.J.1976). However, we find that we may pass upon the district court's disposition of only two, because Trantino did not exhaust available state remedies as to his third claim, which alleges a *Brady*[1] violation.

We affirm the district court's dismissal of all three claims, but we predicate our dismissal of the *Brady* claim not on the merits of that claim but rather on the absence of any indication that the federal claim was "fairly presented to the state courts." *Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971); *Zicarelli v. Gray,* 543 F.2d 466, 474–75 (3d Cir. 1976) (en banc).

### I.

On August 28, 1963, Trantino surrendered to police in New York City, where he was the object of a massive manhunt as the principal suspect in the August 26, 1963 killing of two Lodi, New Jersey policemen.[2] He was extradited to New Jersey, and was held in the Bergen County jail until his

---

1. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

2. The factual background has been set forth at length in the various opinions filed by both state and federal courts. *See* cases cited at note 13 *infra.* We repeat here only those facts bearing on the issues in this appeal.

conviction on two counts of murder on February 18, 1964.

When first incarcerated, Trantino was under the care of a Dr. Sarla, the jail physician. Trantino suffered from what Dr. Sarla diagnosed as tension headaches; consequently, Dr. Sarla prescribed aspirin to provide relief. When the headaches persisted, Trantino was given Equanil, a mild tranquilizer, in twice-daily dosages beginning on October 7, 1963. This regimen continued through October 15, 1963.[3]

On the evening of that day, Trantino, "irritated by a jail employee's verbal abuses, erupted into [a] vocal tirade 'yelling at the top of his head that he was being treated like an animal.'" 408 F.Supp. at 484–85 (transcript citations omitted). Because of this violent outburst, Trantino was placed in an observation cell and was straightjacketed.[4] A Medical Log entry for October 15, 1963 notes Dr. Sarla's observation: "This man is completely unbalanced mentally at the moment, should be under psychiatric treatment and observation."[5] Dr. Sarla, however, was not a psychiatrist.

The "October 15 incident" apparently prompted the state to bring a psychiatrist into the case. Pursuant to a court order,[6] Dr. Joseph Zigarelli, a staff neuropsychiatrist at Greystone Park State Hospital, examined Trantino on October 17, 1963. Dr. Zigarelli wrote a brief letter to the prosecutor summarizing his findings:

On October 17, 1963, Mr. Thomas Trantino, age 25 years, was examined by me at the Bergen County Jail. Patient was informed of the nature of the examination, that it was being done at the request of your office as to his mental condition prior to appearing in court. At that time a complete neuropsychiatric examination was performed. A report of this examination will follow.

It is my considered neuropsychiatric opinion that at the present time Mr. Trantino is mentally competent to consult with counsel. It is also my opinion that at the time of the alleged offense he was able to differentiate right from wrong and able to understand the nature and quality of his actions.

It must be stated, however, that patient is beginning to formulate some paranoid ideas and has expressed some vague feeling of persecution. These, in my opinion, are not sufficiently developed to interfere with his mental status to consult with counsel.

Letter of October 17, 1963, R–34 at 8.

Following his examination of Trantino, Dr. Zigarelli consulted with Dr. Sarla. He recommended that Trantino be treated with Thorazine, a psychoactive drug of considerably greater potency than Equanil. The Medical Log that sets forth Trantino's treatment while he was confined reveals that a dosage of 50 mg./day, four times daily was prescribed and began on October 17, 1963, that the authorized dosage was doubled on October 24, and that thereafter 400 mg./day was prescribed until December 20, 1963, when the authorization for Thorazine treatment ended.

In the interim, Dr. Zigarelli filed his formal report with the prosecutor. Letter of October 23, 1963, R–34 at 9–13. This report concludes as follows:

*Impression:* The impression gained from the initial interview with this individual is that we are dealing with a Sociopathic Personality of long standing. There is evidence of poorly controlled feelings of hostility and anxiety. This individual has never learned from past experiences and has always been able to rationalize his behavior. In spite of this maladjustment there has not been any psychotic episode in my opinion until his most recent episode several days ago. He is now beginning to formulate some vague Paranoid ideas of persecution.

---

3. *See* 408 F.Supp. at 484.

4. Brief for Appellant at 2; Brief for Appellee at 5.

5. Brief for Appellant at 2; Brief for Appellee at 5.

6. *See* Order of October 17, 1963, Respondent's Exhibit No. 34 (hereinafter R–34), at 7.

These are in the beginning stage and are not fully developed. At the present time this individual is fully oriented in all spheres. He is able to fully appreciate his position and is able to consult with counsel. It is my considered Neuropsychiatric opinion that at the present time and at the time of the alleged offense, this individual is and was capable of understanding the nature and quality of his acts and to differentiate right from wrong.

*Id.* at 12–13. The report, however, did not mention the Thorazine prescription.

On November 6, 1963, Trantino's newly appointed counsel made a number of motions to the trial court, seeking, *inter alia,* appointment of a psychiatrist for the defense and procurement of "copies of all medical psychiatric or other examinations made by the State or its agents of the defendant in this case." [7] The motion for medical reports was denied: thus Trantino's attorneys were denied access to the reports received by the prosecutor, *i. e.,* Dr. Zigarelli's letters of October 17 and October 23, 1963.

However, their first request was granted: two psychiatrists, Drs. Samuel Kesselman and Robert Latimer, were appointed for the defense. Doctor Kesselman examined Trantino on December 1; Doctor Latimer, on December 4. Both doctors concluded that Trantino was competent to stand trial and to assist in his defense.

So far as this record reveals, neither was aware of Trantino's ongoing Thorazine and Equanil treatment. That information was apparently not known by defense counsel (nor, for that matter, by the prosecutor)— although it was readily ascertainable from Trantino's Medical Log and Jail Log.[8]

The subject of medication—either his failing or refusing to take prescribed drugs—was not related to his doctors by Trantino or by Trantino's attorney. Trantino's Jail Log further reveals that while medication was made available to Trantino in the prescribed dosages, he often refused it when offered.

Indeed, according to a summary of the Jail Log prepared by the State, Trantino *refused* 139 full doses of Thorazine during the period of authorized treatment (October 17, 1963 through December 19, 1963). He accepted only 59 doses of the drug during the same period. His sporadic acceptance of Thorazine ceased entirely between November 19, 1963 and December 7, 1963: thus he had not taken the drug for 14 days when Doctor Kesselman examined him on December 1, and for 19 days when Doctor Latimer saw him on December 5.

Prescribed Thorazine was offered to and accepted by Trantino for the last time on December 19, 1963. For the three days following still another drug—Compazine— was substituted. Finally, Trantino once again began to receive Equanil, the milder medication which had originally been prescribed prior to his outburst on October 15, 1963. This treatment with Equanil continued throughout his trial, which began February 3 and continued through February 18, 1964. During this period Trantino accepted approximately 75% of the prescribed doses of Equanil.[9]

In addition to authorized medication, however, Trantino claimed to have received some Thorazine from other inmates. The district court's discussion of this contention is as follows:

Recognition of the more potent properties of Thorazine as compared to Equanil directed the state trial court's attention towards petitioner's claim that he secretively obtained Thorazine tablets from another jail inmate on the day of his testimony. It found that Trantino did not obtain the medication on the day of his trial testimony. Relying on the testi-

7. Brief for Appellants at 4, *quoting* Respondent's Exhibit No. 23.

8. The Medical Log is reproduced, in relevant part, at R–34 at 30–33, while the Jail Log is abstracted in Respondent's Exhibit No. 38.

9. *See* Appendix for Appellee at 3a (summarizing Jail Log (Exhibit R–23)).

mony of the two inmates which Trantino claimed could have provided him with the unauthorized Thorazine, the state court found that petitioner had not surreptitiously obtained the two Thorazine tablets on the day that he took the stand in his own defense. This finding of fact is fully supported by the record.

The state trial court found that Trantino did ingest Equanil tablets on the day of his trial testimony, one at 6:15 A.M. and another at 8:00 A.M. on February 14, 196[4]. It, however, found that this medication, Equanil, was a mild tranquilizer that would not affect the ability of Trantino to conduct his defense or to testify. In reaching this finding the trial court discounted the testimony of petitioner's medical expert, Dr. Maximillian Fink, for a variety of reasons. Fink's testimony was based upon the premises that Trantino was ingesting both Equanil and Thorazine during the October 17–December 20, 1963 period and that petitioner took all prescribed doses of medication offered him.[10]

As noted above, Trantino's trial lasted from February 3 through February 18, 1964. The jury found Trantino guilty of both murders. He is presently serving a sentence of life imprisonment [11] in the State Prison at Rahway, New Jersey.

**10.** 408 F.Supp. at 485 (record citations omitted).

**11.** Trantino had been sentenced to death, but he was re-sentenced *nunc pro tunc* to life imprisonment in *State v. Funicello,* 60 N.J. 60, 286 A.2d 55 (per curiam), *cert. denied,* 408 U.S. 942, 92 S.Ct. 2849, 33 L.Ed.2d 766 (1972).

**12.** 28 U.S.C. § 2254(b) reads:

(b) An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner.

**13.** *See* 408 F.Supp. at 478. These proceedings include:

(1) a direct appeal to the New Jersey Supreme Court. That Court affirmed his con-

## II.

The federal habeas corpus statute by its terms precludes the granting of a writ of habeas corpus in the absence of a showing that a petitioner has exhausted his available state court remedies.[12] Thus, when Trantino's petition in this case was filed in 1974, the district court judge was careful to chronicle the post-conviction proceedings in both state and federal court.[13]

Trantino's claims—as his petition denominates them and as the district court opinion sets them forth—are:

(A) That the state prosecutor and his staff deprived petitioner's counsel of the opportunity to interview and confront eye-witnesses to the crime prior to trial.

(B) That the state trial judge failed to hold a hearing on petitioner's competency to stand trial despite evidence casting some doubt on the matter.

(C) That medication administered to the petitioner impaired his ability to aid in the preparation and conduct of his defense, suppressed symptoms of mental illness, and adversely affected his demeanor in court.

(D) That petitioner was denied the effective assistance of his own psychiatrists by the state's failure to inform them of

viction, *State v. Trantino,* 44 N.J. 358, 209 A.2d 117 (1965);

(2) a motion for a new trial. That motion was denied by the Bergen-County Court, and the denial of relief was affirmed by the New Jersey Supreme Court, *State v. Trantino,* 45 N.J. 37, 211 A.2d 193 (1965), *cert. denied,* 382 U.S. 993, 86 S.Ct. 573, 15 L.Ed.2d 479 (1966);

(3) a federal habeas petition. That petition was dismissed for failure to exhaust state remedies, *Trantino v. Yeager,* Civ. No. 351–66 (D.N.J. June 24, 1966);

(4) a petition for state court post-conviction relief. That petition was dismissed by the Bergen County Court after an evidentiary hearing, and the dismissal was sustained by the New Jersey Supreme Court, *State v. Trantino,* 60 N.J. 176, 287 A.2d 177 (1972); and

(5) the above-mentioned action, *see* note 11 *supra,* which resulted in the vacation of Trantino's death sentence.

the psychoactive drugs he was taking, that he was denied the effective assistance of counsel in that the state was permitted to conduct a psychiatric examination in the absence of petitioner's counsel.

(E) That the trial judge improperly charged the jury with respect to the burden of proof on culpable mental state.

(F) That the petitioner was denied a fair and impartial trial because of massive pretrial publicity.

408 F.Supp. at 480.

The district court's analysis of the exhaustion requirement separately considers each issue encompassed within Trantino's six claims. *See id.* at 480–81. This procedure correctly anticipated our discussion in *Zicarelli v. Gray,* 543 F.2d 466 (3d Cir. 1976) (en banc):

a federal habeas court may not entertain a claim presented to it unless the "same claim" had been urged upon the state courts. In order to meet this standard, . . . the argument brought before the federal court must be "the substantial equivalent" of a claim already presented to the state courts; "the substance of"

the claim raised in the federal court must first have been submitted to the state court.

*Id.* at 472, *quoting Picard v. Connor,* 404 U.S. 270, 277, 278, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971).[14]

Here, the district court has separately considered and ruled upon each issue raised by Trantino in terms of exhaustion. Because Trantino has not appealed from the district court's refusal to grant habeas corpus relief based upon claims (A) (confrontation of eye-witnesses); (E) (improper charge) and (F) (pretrial publicity), we need only review the court's "exhaustion" conclusions as to claims (B) (competency hearing); (C) (medication use that impaired defense) and (D) (failure of state to inform as to drugs—*Brady v. Maryland*).[15]

*1.*

Claims (B) and (C) require little discussion. The district court's opinion includes the issues raised by those claims as among those "presented to the state courts on direct appeal and in post-conviction relief proceedings." 408 F.Supp. at 480. Our

---

**14.** In *Picard,* the habeas petitioner had raised a Fourteenth Amendment due process claim in the state courts. Not until his petition had been presented to the federal courts did an equal protection claim surface. Holding that "the substance of a federal habeas corpus claim must first be presented to the state courts," 404 U.S. at 278, 92 S.Ct. at 513, the Supreme Court reversed the judgment of the federal Court of Appeals, which had granted habeas relief. The Court explained:

We emphasize that the federal claim must be fairly presented to the state courts. .If the exhaustion doctrine is to prevent "unnecessary conflict between courts equally bound to guard and protect rights secured by the Constitution," *Ex parte Royall,* [117 U.S. 241, 251, 6 S.Ct.] [734], 740, 29 L.Ed. [868 (1886)], it is not sufficient merely that the federal habeas applicant has been through the state courts. The rule would serve no purpose if it could be satisfied by raising one claim in the state courts and another in the federal courts. Only if the state courts have had the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding does it make sense to speak of the exhaustion of state remedies. Accordingly, we have required a state prisoner to present the state courts with the same claim he urges upon the

federal courts. See *Darr v. Burford,* [339 U.S. 200, 203 [70 S.Ct. 589, 94 L.Ed. 761] (1950)]: *Davis v. Burke,* 179 U.S. 399, 401–403 [21 S.Ct. 210, 211–212, 45 L.Ed. 249] (1900).

404 U.S. at 275–76, 92 S.Ct. at 512. *See also* the Supreme Court's treatment of the exhaustion issue in *Smith v. Goguen,* 415 U.S. 566, 576–77, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974).

For a discussion of *Zicarelli,* see text accompanying notes 19–21 *infra.*

**15.** As a reading of claim (D) indicates, Trantino incorporated two claims in this subdivision. The second of these claims—"that he was denied the effective assistance of counsel in that the state was permitted to conduct a psychiatric examination in the absence of petitioner's counsel"—was dismissed for failure to exhaust state remedies. 408 F.Supp. at 480. *See* Section 2, p. 93 *infra.*

In addition, we find that each of the claims, denominated B, C and D, are separate and distinct and not so interrelated as to preclude us from reaching the merits on any issue where the district court properly found that exhaustion had taken place. Counsel for the petitioner conceded this point at oral argument.

review of the record sustains these conclusions. Issue (B), the substance of which alleges that the state trial judge committed constitutional error in failing to order a competency hearing for Trantino, was raised in post-conviction proceedings in the Bergen County Court, and denial of that claim was apparently affirmed without comment by the New Jersey Supreme Court. *See* Answer to Writ of Habeas Corpus (May 9, 1974) at 2, *United States ex rel. Trantino v. Hatrack,* 408 F.Supp. 476 (D.N.J.1976); *State v. Trantino,* 60 N.J. 176, 181, 287 A.2d 177, 180 (1972). Issue (C), which alleges that the psychoactive medication taken by Trantino impaired his ability to assist in his defense and otherwise deprived him of due process, was raised in the same post-conviction proceedings and was specifically discussed and rejected by the New Jersey Supreme Court. *State v. Trantino, supra,* 60 N.J. at 181–182, 287 A.2d at 179–80. The district court correctly reached the merits of these claims.

We therefore turn to the merits of claims (B) and (C).

### Claim (B)

■ This claim alleges that the state trial court committed error of constitutional dimension when it failed to conduct an inquiry into petitioner's competence to stand trial. In discussing this contention, the district court said:

> It is beyond peradventure that to bring a legally incompetent defendant to trial would violate due process. *Drope v. Missouri,* 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); *Bishop v. United States,* 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1956); *State v. Spivey,* 65 N.J. 21, 319 A.2d 461 (1974); *State v. Auld,* 2 N.J. 426, 67 A.2d 175 (1949). Thus when a *bona fide* doubt is raised as to a defendant's competency to stand trial, the court must conduct a hearing to resolve the issues. *Drope v. Missouri, supra; Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966); *State v. Spivey, supra.* The test of competency to stand trial is that enunciated in *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960):

> [whether a defendant] . . . has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.

> The appreciation of the evidence evincing a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competency to stand trial are among the factors upon which a trial court can rely in its determination whether further judicial inquiry is required.

> > There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated. That they are difficult to evaluate is suggested by the varying opinions trained psychiatrists can entertain on the same facts.

> *Drope v. Missouri,* 420 U.S. 162, 180, 95 S.Ct. 896, 908, 43 L.Ed.2d 103 (1975).

408 F.Supp. at 482–83.

The district court then analyzed the circumstances underlying the paradigmatic *Pate* and *Drope* cases. In both those cases, the trial court was exposed to a plethora of evidence of aberrant behavior which required a competency hearing.

Here, there is no such evidence. As the district court noted, none of the psychiatrists (including those engaged by the defense) who examined Trantino prior to trial indicated any doubts as to his competence to stand trial. Indeed, two of the four doctors testified to that conclusion at Trantino's trial. *See* 408 F.Supp. at 483. Similarly, defense counsel never suggested that Trantino was incompetent or that their representation of Trantino was hampered by his mental or emotional problems. Additionally, the record reveals that the trial judge, in presiding at the state court post-conviction proceedings, commented on the impressive demeanor and extensive vocabulary exhibited by Trantino when he testified in his own defense. *See id.* at 484.

Finally, and conclusively, a competency hearing was held during state post-conviction proceedings, and the findings and conclusions of the state trial court have not been challenged. Such a *nunc pro tunc* procedure has met with approval by this Court. In *United States ex rel. McGough v. Hewitt,* 528 F.2d 339 (3d Cir. 1975), we noted that such a procedure had been sanctioned "when the findings at the post conviction hearing were based on evidence derived from knowledge contemporaneous to the trial." *Id.* at 344. Similar determinations have been authorized in the Second, Fifth, Sixth, Eighth, Ninth and Tenth Circuits, *see United States ex rel. Suggs v. LaVallee,* 523 F.2d 539 (2d Cir. 1975); *Carroll v. Beto,* 421 F.2d 1065 (5th Cir. 1970); *United States v. Makris,* 483 F.2d 1082 (5th Cir. 1973), *decision on remand, United States v. Makris,* 398 F.Supp. 507 (S.D.Tex. 1975); *Conner v. Wingo,* 429 F.2d 630 (6th Cir. 1970); *Rose v. United States,* 513 F.2d 1251 (8th Cir. 1975); *Sieling v. Eyman,* 478 F.2d 211 (9th Cir. 1973); *Barefield v. State of New Mexico,* 434 F.2d 307 (10th Cir. 1970).

In view of these circumstances, we must reject Trantino's contention that the state trial judge committed error of constitutional dimension in not conducting an inquiry into his competency to stand trial. The district court properly dismissed this claim.

### Claim (C)

■ This claim puts in issue the question of whether petitioner was deprived of due process in being required to stand trial after taking psychoactive medication.

Our statement of the facts focused on Trantino's ingestion of drugs prior to and during his trial. *See* Part I *supra.* In addition, we note the state court's post-conviction finding that Trantino had not taken Thorazine, the more potent of the drugs involved here, on the day of the trial—a finding which the district court found to be "fully supported by the record." 408 F.Supp. at 485. *See Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); 28 U.S.C. § 2254(d).

We agree with the district court's conclusion:

The state record clearly demonstrates that petitioner was not affected to his detriment by his voluntary ingestion of medication during his trial or during the pretrial period when his trial counsel consulted with him. During this pretrial period, when Thorazine was offered to petitioner, his refusal of this medication often exceeded his acceptance. (R–35, Oct. 17 to Dec. 20, 1963) During the two months preceding trial, petitioner received only Equanil, a mild tranquilizer, and even this he often refused. (R–35, Dec. 25, 1963 to Feb. 18, 1964) And as the state judge commented at the PCR hearing, his own recollections of Trantino's demeanor preclude the assertion that the Equanil dosage adversely affected petitioner's demeanor before the jury.

408 F.Supp. at 486.

Relief with respect to Claim (C) was properly denied by the district court.

### 2.

Trantino's Claim (D) encounters a more serious obstacle with respect to the exhaustion requirement. It will be recalled that the portion of Claim (D) [16] that the district court decided on the merits alleges:

[t]hat petitioner was denied the effective assistance of his own psychiatrists by the state's failure to inform them of the psychoactive drugs he was taking.

408 F.Supp. at 480. In searching out the constitutional "substance" of this claim, the district court correctly concluded that

petitioner claims that his rights to a fair trial under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), were violated. The asserted violation is the failure of the state to inform defense counsel and defense psychiatrists of petitioner's regimen of psychoactive drugs. *Id.* In reviewing the record of the prior state proceedings, the district court made

---

**16.** *See* note 15 *supra.*

the following findings concerning the exhaustion requirement:

> The issues sought to be raised in allegation (D) were not presented to the state courts before, on direct appeal [*See,* R–14, R–21; *State v. Trantino,* 44 N.J. 358, 209 A.2d 117 (1965)]; on petitioner's Motion for a New Trial [*See,* R–34 at 50–55; R–24; *State v. Trantino,* 45 N.J. 37, 211 A.2d 193 (1966)]; or in petitioner's Petition for Post-Conviction Relief [*See,* R–34 at 144–178; R–29; *State v. Trantino,* 60 N.J. 176, 287 A.2d 177 (1972)].

> *Id.* (brackets in original).

Nothing in the district court's opinion indicates that the finding of "non-exhaustion" as to Claim (D) as a whole does not apply to each issue found within that claim. Like the Fifth and Sixth Amendment claim, *see* note 15 *supra,* the *Brady* claim has not been raised in—let alone "*fairly* presented to" [17]—the state courts.[17a]

17. *Zicarelli v. Gray,* 543 F.2d 466, 474 (3d Cir. 1976) (en banc) (emphasis in original), *quoting Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971).

17a. Judge Gibbons's argument in dissent that Claim (D) has been exhausted depends entirely upon an acceptance of his (not Trantino's counsel's) assertion that one can discern if not the expression of at least the outline of a lurking *Brady* claim which Trantino presented to the New Jersey Supreme Court. As the text sets out, p. 94 *supra,* the district court found that no *Brady* claim had ever been presented to any state court. In order to "construct" the *Brady* claim, the dissent has pieced together fragments of various state court proceedings which took place from 1967 to 1972, disregarding entirely the requirement that for purposes of exhaustion, such a claim or issue must be "fairly presented" to the highest court of the state.

As we understand the dissent, in order to identify the *Brady* issue, we must look first to page 1 of Trantino's 1972 New Jersey Supreme Court brief (appealing a denial of post-conviction relief), where his "Argument 8" appears. This argument, however, does not set forth a *Brady* claim in any respect. Therefore the dissent suggests that we then look to Point H, "Statement of the Case," which appears at page 5 of this 1972 New Jersey Supreme Court brief. However, Point H, as a fair reading will disclose, refers only to Trantino's defense of insanity. But, suggests the dissent, if the *Brady* issue is not in "Argument 8" or in Point "H", look further—look to *an amendment which was made orally at the time of Trantino's post-conviction hearing five years earlier in January 1967.* (The referenced "amendment" does not appear anywhere in the New Jersey Supreme Court brief, and is not even reproduced in the text of Point H at page 48 of that brief). Moreover, that "amendment" (even if it had been presented to the New Jersey Supreme Court) is similarly devoid of *Brady* content (*see* dissent page 99), as are Points A and B which appear at pages 7–34 of the 1972 brief and are referenced at page 99 of the dissent. Significantly Leonard Weinglass, Esq., who was both trial and appellate counsel to Trantino and who thus could have properly formulated a *Brady* issue on appeal, did not do so. Nor for that matter has Trantino's present counsel ever referred to or produced for us the very documents such as the New Jersey Supreme Court brief and the transcript of the post-conviction hearing upon which the dissent relies in its ingenious construction of a *Brady* claim, even though the state at oral argument and in a post-argument letter to this Court has retracted its purported waiver and has urged the issue of nonexhaustion.

As discussed in text, exhaustion of state judicial remedies requires that the state courts be given a fair opportunity to adjudicate a federal habeas petitioner's constitutional claims. Notwithstanding Judge Gibbons' attempt to reconstruct the state court record and find a state court disposition of Trantino's *Brady* claim here, even a liberal reading of the state court records reveals that the state courts had *no* opportunity—let alone a fair one—to decide this *Brady* claim.

Judge Gibbons, after duly acknowledging respect for the New Jersey courts, is forced to concede that the New Jersey Supreme Court disposed of a "serious" *Brady* claim summarily, stating:

> The remaining grounds for post-conviction relief set forth in defendant's position are *so* unmeritorious as not to require specific mention.

60 N.J. at 182, 287 A.2d at 180. We agree fully with Judge Gibbons's respect for the ability of state court judges to provide protection for federal constitutional rights. How, then, is the supposed disposition of this troubling *Brady* claim by summary dismissal to be explained? The answer, we submit, is not that our state court brethren are unresponsive or insensitive to constitutional rights (the answer which Judge Gibbons's analysis would require) but that, like the majority of this Court and the district judge below, the Justices of the Supreme Court of New Jersey could nowhere find a *Brady* claim among the issues submitted to them.

The dissent then states that "the claim that was presented to the Supreme Court of New Jersey is, as I [Judge Gibbons] read it; indistinguishable from claim D." Dis. Op. at 100.

■ Not surprisingly, the failure by Trantino to exhaust Claim (D) was not lost upon the State. We learn from the district court opinion that "[t]he State initially opposed consideration of both issues [in Claim (D)] here for failure to exhaust state remedies." 408 F.Supp. at 480. However, the State then altered its stance respecting the *Brady* claim, indicating that it would withdraw its objection predicated on exhaustion in order to permit the district court to reach the merits of the *Brady* claim.[18] The district court accepted the State's "waiver" of the exhaustion requirement, *see id.,* and went on to reach the merits of that issue.

In doing so, the district court failed to give proper recognition to the comity considerations which underlie § 2254(b). *See Zicarelli, supra,* at 471.

■ We acknowledge that instances may be found of federal courts reaching the merits of non-exhausted claims; however, we believe, with Judge Friendly, that deviation from the exhaustion requirement can only be permitted "in those rare instances where justice so requires." *United States ex rel. Graham v. Mancusi,* 457 F.2d 463, 468 (2d Cir. 1972). Manifestly, the circumstances attending Trantino's *Brady* claim do not justify a departure from the congressionally mandated norms set out in § 2254(b).

■ That there is room for any "deviation" at all from the exhaustion requirement is a measure of the fact that exhaustion is a rule not of jurisdiction, but of comity. *See Fay v. Noia,* 372 U.S. 391, 419–20, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); *Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); *Ballard v. Maggio,* 544 F.2d 1247, 1249 (5th Cir. 1977); *see also Zicarelli v. Gray,* 543 F.2d 466, 471 (3d Cir. 1976) (en banc); *Graham, supra,* at 468. Still, as the Supreme Court said in *Picard v. Connor, supra* : "[i]t has been settled since *Ex Parte Royall,* 117 U.S. 241, 6 S.Ct. 734, 29 L.Ed. 868 (1886), that a state prisoner must normally exhaust available state judicial remedies before a federal court will entertain his petition for habeas corpus." [19]

More recently, this Court emphasized the necessity for strict adherence to the exhaustion requirement in *Zicarelli v. Gray, supra.* In *Zicarelli,* petitioner raised three separate Sixth Amendment claims before this Court *en banc.* As *Picard* mandates, we examined each claim to determine if it had been fairly presented to the state courts. Of the three claims, this Court found that one had clearly been presented to the state courts; a second had just as clearly surfaced for the first time in the federal courts; and a third, while indirectly brought to the state Supreme Court's attention, could not be said to have been fairly presented to that court. *See* 543 F.2d at 473–75. Judge Adams's analysis in *Zicarelli* illustrates the care which a federal court must exercise to en-

We suspect that the Justices of the New Jersey Supreme Court will be surprised at this extraordinary insight and reading.

**18.** At oral argument we were informed that the State no longer desired to waive exhaustion of the *Brady* claim, pointing out that our decision in *Zicarelli* had not been known or available at the time of the district court hearing. (*Zicarelli* was filed on September 10, 1976; the district court's opinion in this case was filed February 19, 1976). Moreover, under date of March 25, 1977, a letter from the Deputy Attorney General of the State of New Jersey formally conceded that waiver may have been inappropriate and had been premised upon an understanding of exhaustion prior to *Zicarelli,* stating:

> An examination of the proceedings in the case at bar conclusively establishes that the *Brady* issue was never explicitly raised in a state forum.

Hence, despite the dissent's assertion that the state is "perfectly willing to have this case decided in a federal forum now," Dis. Op. at 101, quite obviously New Jersey has no such present willingness. As our discussion in text reveals, however, we accord no controlling significance to the State's most recent shift in position, just as we accord none to the State's waiver before the district court.

**19.** 404 U.S. at 275, 92 S.Ct. at 512. *See also Pitchess v. Davis,* 421 U.S. 482, 486, 95 S.Ct. 1748, 1751, 44 L.Ed.2d 317 (1975) (per curiam)

sure that every claim in a habeas petition has been exhausted.[20]

Moreover, in *Zicarelli* the State attempted to "concede" the issue of exhaustion, agreeing with petitioner that the mere submission of a California case discussing various Sixth Amendment issues satisfied the exhaustion requirement. This Court rejected the State's attempt to acquiesce in circumventing the exhaustion requirement:

> This "concession," however, is not dispositive of the issue. First, counsel's statement indicates that he took the transmittal of the [opinion in the California case] to constitute exhaustion as to *all* sixth amendment claims, and did not consider its impact on the separate contentions that are discrete, and in some respects disparate, parts of the sixth amendment. Second, the doctrine of ·exhaustion is a product of the recognized need for coordination and friction-free relations between separate court systems. We have been unable to discover any case where a mere statement from counsel, even from a prosecutor, has been found sufficient to dispose of the element of exhaustion without an independent judicial inquiry.

*Id.* at 471 (footnotes omitted, emphasis added).

Whether a habeas claim may properly be aired in a federal district court is a decision that can be made only by that court, after measuring the claim against the mandate of 28 U.S.C. § 2254. This observation holds true whether counsel "concedes" exhaustion (as in *Zicarelli*) or seeks to "waive" exhaustion (as in the instant case). For § 2254(b) purposes, both concession and waiver amount to nothing more than notice to the · court that the state is unopposed to a feder-

al court reaching the merits of a petitioner's claim. But by the same token, neither concession nor waiver relieves the federal court of its responsibility to decide only those habeas claims which Congress has authorized it to hear under § 2254(b).

■ The basis for rejection of the concept of waiver in this case—like that underlying rejection of concession in *Zicarelli* —is found in the policy underlying the exhaustion requirement. Exhaustion is a rule of comity. "Comity," in this context, is that measure of deference and consideration that the federal judiciary must afford to the co-equal judicial systems of the various states. Exhaustion, then, serves an interest *not* of state prosecutors but of state courts. It follows, therefore, that the state court interest which underlies the exhaustion requirement of § 2254(b) *cannot* be conceded or waived by state prosecutors—for the state court interest in having "an initial 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights"[21] is simply not an interest that state prosecutors have been empowered to yield. "Waiver," like "concession," is not a talisman, the incantation of which will cause the exhaustion requirement to disappear. That requirement remains.

The district court based its acceptance of the State's proffered waiver on three cases: *United States ex rel. Boyance v. Myers,* 372 F.2d 111, 112 (3d Cir. 1967); *Jenkins v. Fitzberger,* 440 F.2d 1188, 1189 (4th Cir. 1971); and *United States ex rel. Kelly v. Maroney,* 414 F.2d 1228, 1231 (3d Cir. 1969). *See* 408 F.Supp. at 480. We find all three decisions to be of dubious validity in light of post-1971 case law; moreover, all three are inapposite to the situation before us.

---

(exhaustion "a precondition to consideration of a federal habeas corpus petition").

**20.** Indeed, several circuits have gone so far as to hold that federal court consideration of *any* claim in a federal habeas petition must await the exhaustion of *every* claim in that petition. *See Galtieri v. Wainwright,* 545 F.2d 942, 943 (5th Cir. 1977); *James v. Reese,* 546 F.2d 325, 327 (9th Cir. 1976) (per curiam). The Supreme Court has yet to pass upon this added requirement, *see Francisco v. Gathright,* 419 U.S. 59,

63–64, 95 S.Ct. 257, 42 L.Ed.2d 226 (1974), and we have yet to be persuaded of its correctness. Nonetheless, the rule of the Fifth and Ninth Circuits is a further indication of increasing insistence on strict compliance with the exhaustion requirement.

**21.** *Wilwording v. Swenson,* 404 U.S. 249, 250, 92 S.Ct. 407, 409, 30 L.Ed.2d 418 (1971), *quoting Fay v. Noia, supra,* 372 U.S. at 438, 83 S.Ct. 822.

First, as outlined above, this Court's *en banc* decision in *Zicarelli* teaches that the exhaustion inquiry will not be stayed by a state prosecutor's willingness to have the federal courts, rather than the state courts, treat with merits of petitioner's claim.

Second, the three cases relied upon by the district court do not reflect the substantial impact of *Picard v. Connor, supra,* and its progeny, and of *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), upon the exhaustion requirement. *Picard,* which was decided after each of the cases cited by the district court, held that every claim raised in a federal habeas petition must have been fairly presented to the state courts. Before the *Picard* decision, federal habeas petitioners could satisfy the exhaustion requirement by simply pointing to a prior trip through state post-conviction processes, without regard to whether *all* of their claims had been decided by the state court. In such a setting, it is conceivable (although now irrelevant) that state waiver could appear plausible once it was shown that petitioner had indeed presented some of his claims to the state courts.

Such was the case in *United States ex rel. Boyance v. Myers, supra.* Of petitioner's two claims, one had indisputably been exhausted. The state prosecutor was willing to waive the exhaustion requirement as to the other claim, and this Court "in the interest of prompt and comprehensive adjudication of all matters in controversy," 372 F.2d at 113, but without further analysis, was persuaded to accept the waiver. *Boyance* is distinguishable for another reason as well. The second "waived" claim in *Boyance* had in fact been at least partially exhausted prior to waiver. This factor distinguishes *Boyance* from the instant case, for it is conceded by all parties and is borne out by the record that Trantino's *Brady* claim has *never* been presented to the state courts. Thus, even if the *Boyance* waiver rule remained viable—which we think it does not—that case would not support the

district court's acceptance of the state's waiver here.

The *Jenkins* and *Kelly* decisions represent insubstantial authority for a waiver rule. In both cases, the state's attorneys apparently convinced the respective courts to accept a waiver of exhaustion on claims only after persuading the courts that the claims were "patently frivolous" and meritless (*Jenkins*) or that the claims could properly be *denied* (as distinct from being granted) even in the absence of exhaustion (*Kelly*). We note that the *Kelly* decision of this Court does represent, at a minimum, a cutting back of the broad general statement of the permissibility of waiver found in *Boyance.* However, we decline to comment on either the *Jenkins* or the *Kelly* rationale for permitting waiver, contenting ourselves with the observation that both cases were decided pre-*Picard* and pre-*Zicarelli,* and that neither case supports the district court's decision to reach the merits here. In short, our conclusion, which is mandated by this Court's *en banc* decision in *Zicarelli,* is in accord with that recently stated by the Second Circuit: "We do not consider that the statutory requirement of exhaustion can be waived by the State." *United States ex rel. Sostre v. Festa,* 513 F.2d 1313, 1314 n.1 (2d Cir. 1975).[22] To the extent that *Boyance* and *Kelly* might be deemed to lead to a contrary conclusion, we are satisfied that they no longer represent the state of the law in this Circuit in light of *Zicarelli.*

Moreover, our attention has not been drawn to any rare or extraordinary circumstance which would permit deviation from the exhaustion standard. *United States ex rel. Graham v. Mancusi, supra,* 457 F.2d at 468. To the contrary, we are aware of at least two factors present in Trantino's *Brady* claim which indicate the wisdom and desirability of requiring exhaustion in this case.

First, as in *Zicarelli, see* 543 F.2d at 475, the state courts must in any event hear the related claim alleging a denial of effective

---

**22.** Significantly, just as we have equated a concession by the State with a waiver of exhaustion, *see* p. 96 *supra,* so too does the Second

Circuit equate a state stipulation with a state waiver. *See Sostre,* 513 F.2d at 1314.

assistance of counsel, *see* note 15 *supra,* which the district court dismissed for failure to exhaust. Second, and most important, we believe that the record as it presently stands is not sufficient to resolve crucial elements of the *Brady* claim now advanced for the first time by petitioner. For example, it is unclear precisely what information concerning Trantino's drug use was known to the state prosecutor, or what knowledge should be constructively charged to the prosecutor for *Brady* purposes. Neither is it clear what was actually known by the prosecutor or the defense counsel with respect to the times of taking and amount of drug ingestion. Additionally, the record is silent as to the availability to the public and to defense counsel of jail and medical logs. Cutting across these uncertainties is Trantino's knowledge of his own use of medication, and the extent to which he imparted that knowledge to others. These are but a few of the unanswered questions which should be addressed in state rather than federal proceedings.

In sum, we conclude that the district court's acceptance of the state's waiver of the exhaustion requirement as it pertained to Trantino's *Brady* claim cannot be sustained.

### III.

We will affirm the order of the district court which dismissed Trantino's petition in all respects save one. With respect to the *Brady* claim asserted by Trantino, we will reverse and remand to the district court with directions that the *Brady* claim be dismissed for failure to exhaust state remedies.

GIBBONS, Circuit Judge, concurring in part and dissenting in part:

I join in the disposition of Trantino's claims B (competency hearing) and C (medication use that impaired defense) I dissent from the disposition of claim D, which alleges:

[t]hat petitioner was denied the effective assistance of his own psychiatrists by the state's failure to inform them of the psychoactive drugs he was taking . . . ..

*See* 480 F.Supp. at 480. The majority opinion states that this contention was not fairly presented to the state courts. I disagree.

### I

In the Supreme Court of New Jersey, *State v. Trantino,* 60 N.J. 176, 287 A.2d 177 (1972), in an appeal from the denial of post-conviction relief, the brief on behalf of Trantino (Exhibit R–29) listed eight questions under the rubric "Statement of Questions Involved," including:

8. Where the defendant is under the influence of tranquilizing drugs at the time he is interviewed by his own psychiatric expert, and the expert is not apprised of that fact, has the defendant been denied his right to a fair trial and due process of law?

In the "Statement of the Case" in the same brief Trantino urged:

H. The petitioner was denied his constitutional right to counsel as guaranteed by the Sixth Amendment of the United States Constitution and the Constitution of the State of New Jersey in that he was deprived of his right to develop the basis for his defense, namely insanity, by virtue of the fact that he was under the influence of medication at the time he was examined by his expert psychiatric witness who was not apprised of that fact (D 517a), (as amended at the time of hearing (D 264a)).

The amendment referred to in the parenthetical appendix reference was to paragraph H of Trantino's lower court Petition for Post-Conviction Relief, which, prior to being amended at the post-conviction relief hearing, alleged in part:

To require [Trantino's] expert witnesses to come to the Bergen County Jail to interview the petitioner while he remained in a jail cell under constant sedation does not satisfy the due process requirement of the Fourteenth Amendment and the requirements of the Sixth Amendment of the United States Constitution and for a denial of fundamental justice, pursuant to R.R. 3:10A–4(b).

Exhibits R–34 at 155. The lower court allowed the amendment, which asserted an additional complaint, namely, that petitioner was under medication at the time he was examined by Dr. Kesselman, the defense psychiatrist, and that the medication was such as to reduce Trantino's psychotic symptoms.[1]

In the argument portion of the brief to the Supreme Court of New Jersey Trantino argued:

"POINT H

APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO COUNSEL AND DUE PROCESS OF LAW IN THAT THE MEDICATIONS ADMINISTERED BY THE SAID AUTHORITIES REDUCED THE SYMPTOMS OF MENTAL ILLNESS AT THE TIME HE WAS EXAMINED BY HIS PSYCHIATRIST THEREBY DEPRIVING HIM OF THE OPPORTUNITY OF DEVELOPING THE DEFENSE OF INSANITY.

*Statement of Facts*

On December 1, 1963, after taking Thorazine for approximately six weeks, Trantino was examined by Dr. Kesselman, a psychiatrist employed by the defense for the purpose of evaluating the mental condition of the defendant. The examination occurred in the cell which Trantino occupied. The resulting report of the psychiatrist was submitted in evidence as Exhibit D–5 (D264a-8). The report reveals that Dr. Kesselman was unaware of the medication then being administered Trantino. Dr. Zigarelli, the psychiatrist who examined Trantino for the State, testified that he, too, was unaware of these medications. Both Dr. Fink and

Dr. Zigarelli stated it would be important for the examining psychiatrist to have knowledge of this course of treatment in order to make an accurate psychiatric evaluation (D326a-9; D326a-2). Thorazine will substantially reduce psychotic symptoms, resulting in a more normal appearance of a psychotic individual, even to a trained psychiatrist (D165a-20; D304a-24).

*Argument*

The appellant shall rely upon the arguments of law set forth in both Points A & B, *supra*, in support of this contention."

The cross-reference to Point A of the brief is to Trantino's legal argument in support of his contention that the Prosecutor, by making it impossible for Trantino to obtain certain information necessary for his defense, denied him "his constitutional prerogative not to be interfered with or unduly hampered by the State in his preparation of the defense." Trantino Brief, Exhibit R–29 at 15. The cross-reference to Point B is to Trantino's legal argument that, unknown to defense counsel, Trantino was on thorazine during his trial and thus unable to participate adequately in his defense. By applying the legal arguments in Points A and B to the factual allegations in Point H there can be no dispute that, in Point H, Trantino was asserting a constitutional violation based on the Prosecutor's failure to inform defense counsel that Trantino was under medication at the time he was examined by the defense psychiatrist and that this lack of information deprived Trantino of his opportunity to develop the defense of insanity.[1A]

---

1. The amendment was orally made during Trantino's post-conviction hearing:

    "Defense Counsel: . . . The petitioner at this point would like to amend a portion of one of the allegations of the Petition, and that is Paragraph H.

    . . . I would like to amend and add to that specific complaint the additional complaint that the petitioner was examined by one of his own psychiatric witnesses [Dr. Kesselman] on December 1, while he was then in the course of medication . . . while his psychotic symptoms, if any, would be in a reduced state."

PCR 264.

1A. In response to my analysis of Trantino's New Jersey Supreme Court brief the majority states, at note 17a:

    [T]he dissent, [suggests] if the *Brady* issue is not in "Argument 8" or in Part "H", look further—look to *an amendment which was made orally at the time of Trantino's post-conviction hearing five years earlier in January 1967*. (The referenced "amendment" does not appear anywhere in the New Jersey Supreme Court brief, and is not even reproduced in the text of Point H at page 48 of that brief). Moreover, that "amendment"

In its opinion the Supreme Court of New Jersey addresses both Point A and Point B at some length. 60 N.J. at 181, 287 A.2d 177. Point H, which is the same as habeas corpus point D, is not discussed specifically, but the court did rule on it, saying:

The remaining grounds for post-conviction relief set forth in defendant's position are so unmeritorious as not to require specific mention.

60 N.J. at 182, 287 A.2d at 180.

It is no wonder, then, that the State, represented by its Attorney General in the federal habeas proceeding, "waived" its earlier contention that there had been no exhaustion of state remedies with respect to point D. The exhaustion contention is plainly inconsistent with the state court record in the post-conviction relief application.

The majority opinion suggests, without expressly stating, that the basis for its holding that claim D was not presented to the New Jersey Courts was the failure of Trantino's state court brief to cite *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by name. Though *Brady v. Maryland,* is not cited, it cannot be disputed that Trantino called to the attention of the New Jersey courts the State's knowledge of the medication and defense counsel's lack of knowledge, and asserted that these facts constituted violations of due process and the sixth amendment right

(even if it had been presented to the New Jersey Supreme Court) is similarly devoid of *Brady* content . . . .. Significantly Leonard Weinglass, Esq., who was both trial and appellate counsel to Trantino and who thus could have properly formulated a *Brady* issue on appeal, did not do so. Nor for that matter has Trantino's present counsel ever referred to or produced for us the very documents such as the New Jersey Supreme Court brief and the transcript of the post-conviction hearing upon which the dissent relies . . ..

(Emphasis in original).

First, the majority's suggestion that the referenced amendment was not presented to the New Jersey Supreme Court is patently false. Trantino's New Jersey Supreme Court brief refers expressly to the amendment as evidenced by the above quotation from the brief. Given this express reference, and the fact that the transcript of the hearing at which the amend-

to effective assistance of counsel. Apparently the majority thinks little of the ability of the justices of the New Jersey Supreme Court to recognize, in the absence of a popularly known case citation, the federal law applicable to the facts alleged in Point H of Trantino's post-conviction relief brief. Tacitly, the majority accuses the seven justices of being ignorant of the decisions of the United States Supreme Court on the duty of the State to make disclosures to defense counsel. In light of that tacit accusation there is a sharp, though perhaps unintended, flavor of irony in the parts of the majority opinion dealing with the tender regard we should have for the feelings of those judges. *See* at 95–99.

The claim that was presented to the Supreme Court of New Jersey is, as I read it, indistinguishable from claim D. Thus, in my view, there has been exhaustion of state remedies. And I predict that when Trantino returns to the state courts this is exactly what he will be told.

II

In support of its argument that the case should go back to the state courts the majority urges:

"that the record as it presently stands is not sufficient to resolve crucial elements of the *Brady* claim now advanced for the first time by petitioner."

ment was made was a part of the record before the New Jersey Supreme Court, there is absolutely no question that the amendment was presented to the New Jersey Supreme Court.

Secondly, the significance of the majority's observation that Leonard Weinglass, Esq. "could have properly formulated a *Brady* issue on appeal [and] did not do so", escapes me. If the majority is judicially noticing the legal ability of Mr. Weinglass to present a *Brady* claim I can only say that this is a novel, and clearly incorrect, use of that evidentiary principle.

Finally, the majority's assertion that Trantino's present counsel has never produced for us Trantino's New Jersey Supreme Court brief and the transcript of the post-conviction hearing is a bald misstatement. Both of these documents were introduced into evidence in the federal district court habeas corpus proceedings and both are part of the record before this court. *See* federal court Exhibits R–29 and R–18; Fed.R.App.P. 10(a); 28 U.S.C. § 2254(f).

At. 98. The reference to "the first time" is, of course, a reiteration of the majority's claim that the words in the quoted sections of Trantino's brief in the Supreme Court of New Jersey did not mean what they plainly say. On that score I rest on Point I above. Turning to the alleged inadequacies of the record, I cannot help noting that seven justices of the Supreme Court of New Jersey, the district court judge and I all agree that the record suffices for the decision of claim D. Thus, among judges who have examined that record in an appellate capacity, the head count on its adequacy is nine to two. The head count, of course, is not significant for the outcome, since a panel of this court is obliged to exercise an independent judgment. However, after exercising that independent judgment the panel is, or at least was, subject to statutory constraints with respect to disposition. When a claim has been presented to the state courts, as claim D clearly has been, if material facts were not adequately developed in the state court hearing, the remedy is not a dismissal of the habeas corpus petition, but a federal court habeas corpus evidentiary hearing. *See* 28 U.S.C. § 2254(d)(3); *Blackledge v. Allison*, 431 U.S. 63, 78, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977); *Harris v. Nelson*, 394 U.S. 286, 298, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969); *Townsend v. Sain*, 372 U.S. 293, 316, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).

The States-Rights faction objected in Congress both to *Fay v. Noia*, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963) and to *Townsend v. Sain, supra.* Still, the standards for federal court factfinding announced in the latter were codified. By directing a dismissal of the petition rather than a remand for an evidentiary hearing the majority defies a deliberate Congressional choice. Conceding, as I must, that there has been encouragement from on high for the dismantling of this statutory scheme for enforcing the Supremacy Clause in the state criminal justice system,[2] I do not share the majority's enthusiasm for being out in front of the Supreme Court's current majority in that effort. Even if I agreed that additional facts must be developed to decide claim D I would remand for findings in the district court as 28 U.S.C. § 2254(d) directs. In this instance, the majority gives the State of New Jersey far more than it asked for, or is entitled to.

### III

The State of New Jersey, represented by its Attorney General, was, and remains, perfectly willing to have this case decided in a federal forum now, for the obvious common sense reason that it must ultimately be resolved in a federal forum in any event. The State of New Jersey, through its Attorney General, litigated the case in the federal district court and in this court. Despite the fact that the case has been fully litigated, the majority holds that the carefully considered choice of the State of New Jersey, made by its highest law officer, not only does not bind that sovereign state, but must be rejected. No reference is made to any limitations upon the authority of the Attorney General under New Jersey law. Under that sovereign state's law the Attorney General is a constitutional officer. N.J. Const. Art. V, § 4, ¶ 3. As the head of the Division of Law he has the statutory duty to appear for all instrumentalities of state government in actions brought against them, and to "[a]ttend generally to all matters in which the State or any officer, department, board, body, commission or instrumentality of the State Government is a party or in which its rights or interests are involved . . . ." N.J.S.A. 52:17A–4(g). Despite this clear expression of state law as to the Attorney General's authority, the majority holds that he lacks authority to "waive" the separate interest of the state judges in having the first opportunity to pass on Trantino's *Brady* claim. Certainly the state judiciary is an "instrumentality of

---

**2.** *E. g., Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); *Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976); *Francis v. Henderson*, 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976); *Wainwright v. Sykes*, —— U.S. ——, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

the State Government." Certainly the Attorney General has both the authority and the duty to speak for that instrumentality in a habeas corpus case if, in such a case, the "rights or interests" of that instrumentality are somehow separately involved. Certainly nothing in New Jersey law supports the novel proposition that the Attorney General lacks authority to speak in a habeas corpus case on behalf of the separate interests, if any, of the state judiciary. Obviously, then, the majority is announcing a rule of federal law with respect to the State Attorney General's authority. The analysis which leads to the announcement of this federal law limitation on the authority of the State Attorney General is worth quoting:

> The basis for rejection of the concept of waiver in this case—like that underlying rejection of concession in *Zicarelli* —is found in the policy underlying the exhaustion requirement. Exhaustion is a rule of comity. "Comity", in this context, is that measure of deference and consideration that the federal judiciary must afford to the co-equal judicial systems of the various states. Exhaustion, then, serves an interest *not* of state prosecutors but of state courts. It follows, therefore, that the state court interest which underlies the exhaustion requirement of § 2254(b) *cannot* be conceded or waived by state prosecutors—for the state court interest in having "the initial 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights" is simply not an interest that state prosecutors have been empowered to yield.
>
> "Waiver," like "concession," is not a talisman, the incantation of which will cause the exhaustion requirement to disappear. That requirement remains. (footnote omitted).

At 96.

Sometimes, when the self-generation of a legal doctrine through selective regurgitation of case law reaches extremes, it is appropriate to go back to first principles and to reexamine the premises underlying the doctrine. The doctrine to which the majority says it adheres is that "comity" is owed not to sovereignties, but to judges. This fallacy, to which I have referred on another occasion,[3] is basic.

I start with the proposition that the only source of the obligation of a federal court having subject matter jurisdiction (which here the majority concedes) to give judgment preclusion effect to state court judgments is statutory. Unlike state courts, which are explicitly bound both by the Full Faith and Credit Clause and the Supremacy Clause, federal courts exercising the judicial power of a separate, and in federal law matters superior, sovereignty would be free, except for a federal statute to the contrary, to disregard the *res judicata* effect of state court judgments. The statute which is the source of our obligation to give any judgment preclusion effect to a state court judgment, civil or criminal, is the Act of May 26, 1790, 1 Stat. 122, now found in the last paragraph of 28 U.S.C. § 1738. That statute obliges us to afford to such judgments, as well as to state statutes, "the same full faith and credit . . . as they have by law or usage in the courts of such State . . . ."

Prior to 1867 that statute had no great significance for judgments in state criminal cases, as the lower federal courts lacked a subject matter jurisdiction under which such judgments might be brought in issue. In that period the Supreme Court, bound by the proviso in § 25 of the Judiciary Act of 1789, 1 Stat. 85, was obliged to defer to state court decisions on state law issues, though it possessed appellate jurisdiction over state court judgments rejecting federal claims, even in criminal cases. *See Cohens v. Virginia,* 6 Wheat. 264, 5 L.Ed. 257 (1821). States-Rights advocates objected strenuously to the invasion of state sover-

---

3. *State v. New Jersey v. Chesimard,* 555 F.2d 63 (3d Cir. filed March 9, 1977) (Gibbons J., dissenting).

eignty represented by *Cohens v. Virginia,* but, so far as I know, even Spencer Roan, fulminating in the Richmond Enquirer against the constitutionality of § 25, never suggested that the state judges of Virginia had an interest, separate from the Virginia Commonwealth, in freedom from interference by another sovereign with its judgment. *See generally* C. Warren, The Supreme Court in United States History, Vol. I at 554–59 (1922). And since *Cohens v. Virginia* it has not been successfully contended that any federal court having subject matter jurisdiction has any constitutional, as distinguished from statutory, obligation to give preclusive effect to a determination of federal law by a state court.

"Comity" is a term borrowed from international law, having nothing to do with the relationship between judges, but referring to the relationship between sovereigns. As Justice Gray explains in *Hilton v. Guyot,* 159 U.S. 113, 163, 16 S.Ct. 139, 143, 40 L.Ed. 95 (1895):

> No law has any effect, of its own force, beyond the limits of the sovereignty from which its authority is derived. The extent to which the law of one nation, as put in force within its territory, whether by executive order, by legislative act, or by judicial decree, shall be allowed to operate within the dominion of another nation, depends upon what our greatest jurists have been content to call "the comity of nations." Although the phrase has often been criticized, no satisfactory substitute has been suggested.

> "Comity", in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own

citizens or of other persons who are under the protection of its laws.

Since federal law, constitutional and statutory, operates within the territory of the states *ex proprio vigore* by virtue of the Supremacy Clause, as a matter of absolute obligation rather than as a matter of grace, the use of the term comity in the context of the federal union has always been misleading. The law, if any, to which federal sovereignty affords comity cannot be the state's pronouncement of federal law, but only the state's pronouncement of its own criminal, civil, or procedural law.

Use of this misleading term first crept into the interpretation of the Act of May 26, 1790 not as a way of imposing greater obligations on federal courts regarding state judgments, but as a limitation on the rather absolute wording of that statute. In *D'Arcy v. Ketchum,* 11 How. 165, 13 L.Ed. 648 (1850), for example, the Court considered a New York statute which provided that a New York judgment in a suit against a partnership was good against all partners so long as one was served. Despite the plain language of the May 26, 1790 Act, the Court held that the New York judgment need not be enforced by a federal court sitting in Louisiana against a partner not served in New York. All that was intended by the 1790 Congress, the Court reasoned, was to codify settled principles of international law—comity—which did not require recognition of the effect of the New York statute.[4] *See also McElmoyle v. Cohen,* 13 Pet. 312, 10 L.Ed. 177 (1839); *Thompson v. Whitman,* 85 U.S. 457, 21 L.Ed. 897 (1873). But to rely on the principle of comity as a reason for restricting the application of the Act of May 26, 1790 is something quite different from the use to which the term has been put by the majority.

In 1867, in its first grant of original federal question jurisdiction, Congress passed the Act of February 5, 1867, 14 Stat. 385,

---

4. Today, the same result might be required because of the Due Process Clause of the fourteenth amendment.

which eliminated the proviso in § 14 of the Judiciary Act of 1789 prohibiting federal courts from issuing writs of habeas corpus for state prisoners. For reasons which need not here detain us,[5] that statute did not reach the Supreme Court until 1886. In *Ex Parte Royall,* 117 U.S. 241, 6 S.Ct. 734, 29 L.Ed. 868 (1886), a pretrial habeas corpus challenge to a state court indictment, the Court construed the language of the 1867 statute as permitting the denial of the writ pending exhaustion of state remedies. There, the Court spoke of comity, not between judges, but between tribunals of separate sovereignties. The *Royall* holding was codified in 1948. *See* 28 U.S.C. § 2254(b). If there is any statutory authority for the proposition that comity means not only comity to the sovereignty of New Jersey, represented by its highest law officer, but also, and separately comity to the tender feelings of the state court judges, it must be in that codification. I do not find it in 28 U.S.C. § 2254(b), either expressly or by reasonable implication. Nor would I put it there, since, despite the majority's *ipsi dixit,* there is no interest of the state court judges, separate from that of the sovereign whose judicial power they exercise, worthy of federal recognition, as an additional obstacle to the enforcement of the Supremacy Clause. Indeed, if there were such a separate interest, the dryly logical extension of its federal recognition (which would not surprise me in the current climate of hostility to federal Supremacy Clause remedies) would be a requirement that separate counsel be appointed to represent the state judges both in habeas corpus cases and on direct appeal to the Supreme Court.

But, even assuming *arguendo* the correctness of the majority's position, that the doctrine of comity is concerned with the operation of the concurrent judicial systems; the majority, in the instant case, does a grave and inexcusable injustice to the very principles it purports to recognize. As I have stated, New Jersey has statutorily granted its Attorney General authority to speak on behalf of its Judiciary in federal proceedings. For a federal court to determine, *sua sponte,* that this state delegation of power is to be ignored is an unjustified and unnecessary intrusion into the interrelationships between the separate judiciaries, and, more importantly, the separate sovereignties. And to justify such an intrusion in the name of comity, a doctrine which all agree is primarily concerned with respecting the powers of other institutions, is to make a mockery of the doctrine. In the final analysis, in the name of comity the majority has concluded that the New Jersey Courts are not only deserving of respect from the federal judiciary but also in need of protection from a state legislature which has conferred on that State's Attorney General authority to determine the propriety of waiving the exhaustion requirement in a federal habeas corpus proceeding.

IV

The majority holding, making the exhaustion requirement essentially an element of subject matter jurisdiction, is inconsistent with the settled case law of the Third Circuit. *E. g. United States ex. rel. Richardson v. Rundle,* 461 F.2d 860, 864 (3d Cir. 1972), *cert. denied,* 410 U.S. 911, 93 S.Ct. 971, 35 L.Ed.2d 273 (1973); *United States ex rel. Gockley v. Myers,* 411 F.2d 216, 219 (3d Cir. 1969) (in banc), *cert. denied,* 396 U.S. 847, 90 S.Ct. 96, 24 L.Ed.2d 96 (1969); *United States ex rel. Boyance v. Myers,* 372 F.2d 111, 112 (3d Cir. 1967). The majority opinion, without mentioning *Richardson* or *Gockley,* urges that *Boyance* was overruled, *sub silentio,* in *Zicarelli v. Gray,* 543 F.2d 466 (3d Cir. 1976) (in banc). If *Zicarelli* overruled *Richardson, Gockley* and *Boyance* it certainly did so by stealth, since they are nowhere mentioned. Attributing to the court in banc an intention to overrule them by silence in *Zicarelli v. Gray* is simply not a candid treatment of that opinion, or of the issue it addresses.

---

5. *See Ex parte McCardle,* 7 Wall. 506, 19 L.Ed. 264 (1869).

The circumstances of *Zicarelli* and this case are entirely different, for in *Zicarelli* one sixth amendment claim, the "previously-ascertained-by-law" issue, actually did not surface until the oral argument before this court in banc. It had not been presented even to the federal district court. The other claim in dispute on the issue of exhaustion related to the "cross-section" requirement of the sixth amendment. Since the cross-section claim was factually related to the previously-ascertained-by-law claim, as to which state proceedings were undisputedly required, we held that "it would best serve the interest of judicial economy and efficiency of *Zicarelli* to present his cross-section claim at the same time." 543 F.2d at 475. To suggest that had the previously-ascertained-by-law claim been litigated in the district court by the Attorney General we would nonetheless have vacated the judgment and required relitigation is to read something into *Zicarelli* that simply is not there. Finding it there is an example of the wish being father to the thought.

Furthermore, there is no discussion in *Zicarelli* on the question of whether a state attorney general may waive the exhaustion requirement. The absence of such a discussion is quite understandable given the fact that there was no waiver issue in *Zicarelli*, and that federal courts are not in the business of writing advisory opinions. To infer from this court's rejection of the state's attempt in *Zicarelli* to concede a legal point it had vigorously pursued and lost in federal district court, the overruling of this court's express rule in *Boyance* allowing waiver, brings into sharp focus the inherent conflict between this court's longstanding rule that a panel of this court cannot overrule a prior decision of this court and broad interpretations of the scope of this court's in banc decisions.

V

The strenuous efforts of the majority to separate the interests of the state judges, by a misinterpretation of § 2254(b), and in disregard of settled precedents in this circuit, obviously would not have been undertaken if the majority could comfortably affirm, on the merits, the dismissal of the legal issues raised in claim D. But the federal questions presented by that claim are not so easily disposed of as they were either by the Supreme Court of New Jersey or in the opinion of the district court. Since the majority opinion does not reach those questions, which almost certainly will be presented here again, it is not appropriate for me to say more than that they are serious. I would not, however, because of their difficulty, turn habeas corpus procedure into a kind of obstacle course reminiscent of the days before the demise of the adequate and independent state ground rule in habeas corpus.